**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTA FREITAG, Court-appointed permanent receiver for ANI Development LLC, American National Investments, Inc., and their subsidiaries and affiliates,<br><br>                                     Plaintiff,<br><br>     v.<br><br>HORACIO VALEIRAS, Trustee of The Valeiras Family Trust Dated July 20, 2007, and DOES 1 through 10, inclusive,<br><br>                                     Defendants. | Case No.:  21-cv-1625-LAB-AHG<br><br>**ORDER:**<br><br>**1)     GRANTING PLAINTIFF KRISTA FREITAG'S MOTION FOR SUMMARY JUDGMENT, [Dkt. 32]; and**<br><br>**2)     DENYING DEFENDANT HORACIO VALEIRAS'S MOTION FOR SUMMARY JUDGMENT, [Dkt. 31]** |

Plaintiff Krista Freitag (the "Receiver"), the Court-appointed permanent receiver for ANI Development, LLC ("ANI Development"); American National Investments, Inc.; and their subsidiaries and affiliates (collectively, "Receivership Entities"), filed this suit on September 16, 2021, against Defendant Horacio Valeiras, trustee of The Valeiras Family Trust dated July 20, 2007 ("VFT"), alleging that the Receiver is entitled to $468,041.03 (the "Profit Amount") plus prejudgment interest for an actual and constructive fraudulent transfer under California's Uniform

Voidable Transactions Act ("CUVTA"), codified in California Civil Code section 3439, *et. seq.* (Dkt. 1). On April 20, 2023, Valeiras filed a Motion for Summary Judgment on the Receiver's fraudulent transfer claim asserting summary judgment is proper because VFT didn't make an investment into the Ponzi scheme. (Dkt. 31). On the same day, the Receiver also filed a Motion for Summary Judgment or Partial Summary Judgment asserting summary judgment is proper because VFT was an investor in the Ponzi scheme and received fictitious profits.[1] (Dkt. 32). Each party submitted a response in opposition to the other party's motion, (Dkt. 35, 36), and reply briefs, (Dkt. 37, 38).

The Court having read and considered all materials in support of and in opposition to the motions rules as follows.

## I.   Background

### A.   Ponzi Scheme Generally

It's undisputed that Gina Champion-Cain, in connection with the Receivership Entities she controlled, perpetrated a Ponzi scheme from 2012 to 2019 where investor money was solicited to fund loans to liquor license applicants. (Dkt. 33 at J-

---

[1] In support of her motion for summary judgment or partial summary judgment, the Receiver requests judicial notice of documents introduced or filed in cases before this Court: (1) *SEC v. Champion-Cain et al.*, No. 19-cv-1628-LAB-AHG ("*SEC Action*"); (2) *United States v. Champion-Cain*, No. 20-cr-2115-LAB ("*Champion-Cain Criminal Action*"); (3) *Valeiras v. Freitag*, No. 21-cv-1569-LAB-AHG ("*Valeiras Dec. Relief Action*"); and (4) *Freitag v. Levene et al.*, No. 21-cv-1754-LAB-AHG ("*Levene Action*"). (Dkt. 32-4). Courts may take judicial notice of court records from another case. *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1125 (C.D. Cal. 2015) (citing *United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004)); *see also Gamarro v. Walgreen Pharmacy Servs. Midwest, LLC*, No. 22-cv-01811-MEMF (SPx), 2023 WL 2713987, at *2 (C.D. Cal. Mar. 30, 2023) (citing *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132–33 (9th Cir. 2012) and *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007)) ("Documents on file in federal and state court are undisputed matters of public record and therefore appropriate for judicial notice."). "But the Court 'can only take judicial notice of the *existence* of those matters of public record . . . but not of the *veracity* of the arguments and disputed facts contained therein.'" *Almont Ambulatory Surgery Ctr., LLC*, 99 F. Supp. 3d at 1125 (emphasis in original) (quoting *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004)). The Court **GRANTS** the Receiver's request for judicial notice but doesn't take judicial notice of any disputed facts stated in the public records.

1–2). California state law requires liquor license applicants to deposit funds equal to the license purchase price in an escrow account while the application is pending with the state. (Dkt. 1 ¶ 9). Champion-Cain used this regulatory requirement as an alleged investment opportunity. (*Id.*). She represented to investors that their funds were being loaned to liquor license applicants at a high interest rate to help them meet California's liquor license regulatory requirements ("the ANI Loan Program"). (*Id.*; Dkt. 33 at J-16). She solicited investors by informing them that Chicago Title Company ("Chicago Title") was the escrow company. (Dkt. 33 at J-17). In this scheme, ANI Development used Chicago Title as the escrow company for the ANI Loan Program. (*Id.* at J-3).

These investment opportunities were entirely fictitious, and any profits paid to early investors were financed by newer investors. (Dkt. 1 ¶ 11). On August 28, 2019, the SEC filed a complaint against Champion-Cain and ANI Development for violations of federal securities law. (*Id.* ¶ 12; Dkt. 32-5 at Ex. 18[2]; 33 at J-125–26). The very next year, the United States charged Champion-Cain with conspiracy, securities fraud, and conspiracy to commit securities fraud and obstruction of justice. (Dkt. 1 ¶ 15; 32-5 at Ex. 23[3]; 33 at J-129–30). Champion-Cain agreed to waive indictment and entered into a plea agreement in which she admitted the liquor license loan investment opportunities were part of a fraudulent Ponzi scheme. (Dkt. 1 ¶ 15; 32-5 at Ex. 24[4]; 33 at J-131–32).

Kim Peterson was an early investor in the ANI Loan Program and founded Kim Funding, LLC ("Kim Funding") and other entities (collectively, "Peterson

---

[2] *See* Compl., *SEC Action* (S.D. Cal. Aug. 28, 2019), ECF No. 1. The Court cites this document as Dkt. 32-5 at Ex. 18 moving forward.

[3] *See* Information, *Champion-Cain Criminal Action* (S.D. Cal. July 22, 2020), ECF No. 1. The Court cites to this document as Dkt. 32-5 at Ex. 23 moving forward.

[4] *See* Plea Agreement, *Champion-Cain Criminal Action* (S.D. Cal. July 22, 2020), ECF No. 5. The Court cites to this document as Dkt. 32-5 at Ex. 24 moving forward.

Entities") to help solicit investors to invest in the ANI Loan Program. (Dkt. 33 at J-13, J-18, J-22). The Peterson Entities, including Kim Funding, were insiders in the fraudulent scheme because they were involved at a "more intimate level" than the typical investor. (*Id.* at J-18; Dkt. 32-5 at Ex. 21, 452, 454[5]). "The Peterson Entities were explicitly created to raise capital for investment in the liquor license lending scheme." (Dkt. 32-5 at Ex. 21, 452). Furthermore, Kim Funding was a one percent equity holder and fifty percent voting member of ANI Development. (Dkt. 1 ¶ 10; 32-5 at Ex. 21, 452). As a result of being insiders, those investors solicited by Peterson, and not the Peterson Entities themselves, were found to be the proper claimants because "most of the funds solicited by Peterson were transferred directly to Chicago Title without moving through the Peterson Entities." (Dkt. 32-5 at Ex. 21, 453–54).

## B.   Valeiras's Involvement

### i.   2014 HAV Agreement

In late 2014, Peterson and Champion-Cain each spoke with Valeiras about how to become a potential investor and how the ANI Loan Program functioned. (Dkt. 33 at J-14–15). Peterson represented to Valeiras that he and his company, Kim Funding, were investors in the ANI Loan Program. (*Id.* at J-19). Valeiras formed a limited partnership called HAV in 2013, and entered into an agreement with Peterson in December 2014 (the "2014 HAV Agreement"). (*Id.* at J-6–8, J-28, J-32; Dkt. 31-6), The 2014 HAV Agreement provided Kim Funding financing up to $2,000,000 that would be "used to fund escrow accounts of applicants seeking to obtain approvals of transfers of licenses from the California Department of Alcohol Beverage Control." (Dkt. 31-6 at 1). It stated that Kim Funding was affiliated with ANI Development, and that Chicago Title would accept the proceeds of each loaned

---

[5] *See* Order Approving Receiver's Recommended Treatment of Claims, *SEC Action* (S.D. Cal. Feb. 24, 2023), ECF No. 958 at 14, 16. The Court cites to this document as Dkt. 32-5 at Ex. 21 moving forward.

amount. (*Id.*). As a result of the 2014 HAV Agreement, HAV became an investor in the ANI Loan Program, and by February 2016 it increased its investment to $6,000,000 and the standardized investment return rate was 15.6% for liquor license loans that successfully closed and ten percent for loans that were unsuccessful. (Dkt. 33 at J-33–36). Peterson and Valeiras disputed over the interest rate, so Valeiras decided, on HAV's behalf, to withdraw from the ANI Loan Program in September 2017; however, HAV didn't received back its funds and purported returns until June 2018. (*Id.* at J-89, J-92).

### ii.    2016 VFT Agreement

In February 2016, Peterson asked Valeiras about a "bridge loan." (*Id.* at J-37). Valeiras decided that VFT would make the loan because any loan to Kim Funding would have to be from a source other than HAV, which was already fully invested based on its risk tolerance. (*Id.* at J-39–42). For the additional investment, Peterson proposed the initial concept to Valeiras:

> What I was thinking was that you do say $2 million like we have done before (Same Loan Request and Escrow documents provided), with the understanding that within 60-90 days you get taken out of those Escrows, at which time, you get your money back and interest and assign to whomever I identify, your position in those Escrows. That way, you are secured much like you are already with the $6 Million.

(*Id.* at J–44; Dkt. 31-7 at 1). Valeiras responded with a counteroffer: "I was rethinking structure. Since I have to pay interest on my [home equity] loan every month, maybe it makes sense to make this a loan to Kim Funding, secured on something, that pays interest monthly at 15% per year on outstanding balances." (Dkt. 33 at J-45; 31-8 at 1). In February 2016, VFT agreed to make the loan, and the following month the parties entered into an agreement (the "2016 VFT Agreement"), which was a modified version of the 2014 HAV Agreement. (Dkt. 33 at J-48–50, J-54; *see also* Dkt. 31-10). The 2016 VFT Agreement provided Kim Funding financing up to $2,000,000 that would be "used to fund escrow accounts

of applicants seeking to obtain approvals of transfers of licenses from the California Department of Alcohol Beverage Control." (Dkt. 31-11 at 1[6]; *accord* Dkt. 33 at J-57, J-65). The 2016 VFT Agreement stated that Kim Funding was affiliated with ANI Development, and that Chicago Title would accept the proceeds of each loaned amount. (Dkt. 31-11 at 1; 33 at J-55–58).

The two parties officially terminated the 2016 VFT Agreement on November 7, 2017. (Dkt. 33 at J-94). However, between March 7, 2016, and July 12, 2017, VFT made five transfers of money to Chicago Title, totaling $3,300,000. (*Id.* at J-74–75). Between April 8, 2016, and November 8, 2017, VFT received twenty-one transfers of money from Kim Funding, totaling $468,041.03. (*Id.* at J-78–79). Between September 29, 2016, and November 10, 2017, VFT received eight transfers of money from Chicago Title, totaling $3,300,000. (*Id.* at J-76–77).

### iii.    2019 HAV Agreement

In December 2018, Peterson approached Valeiras to rejoin as an investor or enter into another bridge loan. (*Id.* at J-95–96). HAV declined to come back as an investor, but Valeiras agreed to do another bridge loan on behalf of HAV for $3,000,000 for ninety days at fifteen percent. (*Id.* at J-95–97). Valeiras declined the opportunity for another bridge loan on VFT's behalf. (*Id.* at J-97). Kim Funding repaid the bridge loan from HAV in April 2019. (*Id.* at J-98). Two months later, HAV entered into another agreement for a bridge loan (the "2019 HAV Agreement"), but this time for $6,000,000 at thirteen percent.[7] (*Id.* at J-99–102, J-107, J-110; *see*

---

[6] The Receiver also submitted a copy of the 2016 VFT Agreement. (Dkt. 32-5 at Ex. 11). The Court cites to this document as Dkt. 31-11 moving forward.

[7] At the time HAV funded the loan pursuant to the 2019 HAV Agreement, Frontier was the general partner with a 1.4% interest in HAV, (Dkt. 33 at J-114), VFT was a limited partner with 18.1% interest in HAV, (*id.* at J-116), Valeiras Rollover IRA was a limited partner with 8.5% interest in HAV, (*id.* at J-117), and Valeiras Roth IRA was a limited partner with 9.5% interest in HAV, (*id.* at J-119). Valeiras was a managing member of Frontier and held a 28% interest, (*id.* at J-115), and VFT was a beneficiary of the Valeiras Rollover IRA and Valeiras Roth IRA, (*id.* at J-118, J-120). The non-Valeiras limited partners, including David Valeiras (Valeiras's adult son), held approximately 62.5% of the interests in HAV. (*Id.* at P-87).

6

*also* Dkt. 31-19[8]). The 2019 HAV Agreement provided Kim Funding financing up to $6,000,000 that would be "used to fund escrow accounts of applicants seeking to obtain approvals of transfers of licenses from the California Department of Alcohol Beverage Control." (Dkt. 31-19 at 1; *accord* Dkt. 33 at J-101–03). The 2019 HAV Agreement stated that Chicago Title would accept the proceeds of each loaned amount. (Dkt. 31-19 at 1; 33 at J-104, J-112).

At the end of 2019, Champion-Cain's Ponzi scheme was revealed. (*See* Dkt. 33 at J-123). Some of HAV's limited partners threatened a lawsuit against HAV, Valeiras, and/or Frontier Global Partners, LLC ("Frontier"). (*Id.*). To resolve these potential claims, all partners in HAV, excluding VFT, were liquidated through deposits of $1,250,000 by Frontier's insurer, Chubb, and $1,474,864 by VFT. (*Id.* at J-124). Valeiras doesn't dispute that HAV was an investor in the Ponzi scheme starting in 2017. (Dkt. 31-1 at 2).

## C.   The *Levin Action*

In March 2020, a civil action was filed against Chicago Title, Peterson, and other defendants in the Superior Court of California for the County of San Diego entitled *Levin et al. v. Chicago Title Co., et al.*, No. 37-2020-00016983-CU-MC-CTL ("*Levin Action*"). (Dkt. 33 at J-135). HAV was one of the named plaintiffs. (*Id.* at J-136–37). In 2021, the parties in the *Levin Action* settled and Chicago Title paid HAV approximately $2,730,219, which was distributed as follows: VFT received approximately $2,130,196, Chubb received approximately $456,326, and Frontier received approximately $126,806. (*Id.* at J-138). When HAV calculated its net loss, it didn't reduce the $468,041.03 net gain that VFT received under the 2016 VFT Agreement. (*Id.* at P-99). In December 2021, the Receiver sent Valeiras a revised claim packet that reflected HAV's recovery rate of 97.62% based on following: (a) HAV paid $27,958,465.20 into the ANI Loan Program pre-receivership; (b) HAV

---

[8] The Receiver also submitted a copy of the 2019 HAV Agreement. (Dkt. 32-5 at Ex. 10). The Court cites to this document as Dkt. 31-19 moving forward.

21-cv-1625-LAB-AHG

received $24,562,018.50 from the ANI Loan Program pre-receivership; and (c) HAV received $2,730,218.84 from Chicago Title post-receivership. (*Id.* at J-142). HAV's net loss was around $666,227.86, (*id.*), but didn't account for the $1,250,000 payment received from Chubb, (*see id.* at P-118). Neither HAV nor VFT submitted a claim in the receivership. (*Id.* at J-143–44).

### D.   Forensic Accounting

After the Court appointed the Receiver, she completed a forensic accounting and analysis of the Ponzi scheme. (*Id.* at P-19). As part of her duties, the Receiver completed a money-in money-out ("MIMO") accounting to determine whether an investor was a losing investor or a profiting investor. (*Id.* at P-64–65). The Receiver seeks to recover the $468,041.03 in the alleged fictitious profits that Valeiras, as trustee of VTF, received as part of the 2016 VFT Agreement he made with Kim Funding. (*Id.* at D-52).

Between February 2016 and November 2017, Kim Funding received an aggregate total of $1,188,634.50 directly from ANI Development, of which $858,541.83 was deposited into KP-TPB-1274 (the "Torrey Pines Bank account") and $330,092.67 was deposited into KP-WFB-4536 (the "Wells Fargo account") (collectively, the "Kim Funding Accounts"). (*Id.* at P-35–37). Around the same time, Kim Funding also received an aggregate total of $11,030,629.06 from Chicago Title, of which $7,810,864.64 was deposited into the Torrey Pines Bank account and $3,219,764.42 was deposited into the Wells Fargo account. (*Id.* at P-39–41).

The Kim Funding Accounts had an initial combined balance of $46,853.40 on April 8, 2016. (*Id.* at P-44). ANI Development and Chicago Title deposited a total of $18,508,111.09 into the Kim Funding Accounts, which Kim Funding was able to disburse $18,332,764.69, leaving a balance of $222,199.80 on November 8, 2017. (*Id.* at P-45–47). The $468,041.03 VFT received pursuant to the 2016 VFT Agreement was paid out of the Kim Funding Accounts. (*Id.* at P-54).

Due to the magnitude of the Ponzi scheme, investor funds were commingled

into numerous accounts, including the Kim Funding Accounts, which prevented an in-depth tracing analysis. (*Id.* at P-57–58). Deposits into the Kim Funding Accounts were "from Peterson's family and trust, ANI Development, Chicago Title, and investors." (*Id.* at J-81).

The Receiver also conducted a "macro" level tracing analysis. (*Id.* at P-59). The "macro" analysis revealed that out of all the net sources of funds in the Kim Funding Accounts, ninety-eight percent of the net source of funds were funds related to the scheme, including from Chicago Title accounts, ANI accounts, and other investors. (*Id.* at P-59–62).

## II.   LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, the moving party must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (citation omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 242. The

court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In ruling on a motion for summary judgment, the court only needs to consider cited materials, but may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The court isn't obligated to scour the record. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and brackets omitted). In doing so, the court must consider the evidence submitted in support of both motions before ruling on each of them. *Id.*

## III.   ANALYSIS

### A.   Evidentiary Objections

Prior to addressing the motions for summary judgment, the Court must address the evidentiary objections raised by the parties. The Receiver objected to parts of Valeiras's declaration based on the following grounds: (1) vague; (2) improper opinion or legal conclusion; (3) lack of foundation; and (4) hearsay. (Dkt. 35-1). The Receiver also objected to a paragraph in Louis A. Mezzullo's declaration based on the following grounds: (1) vague; (2) lack of relevance; and (3) improper opinion or legal conclusion. (Dkt. 35-2). Finally, the Receiver objected to Valeiras's portion of the Joint Statement of Undisputed Facts ("JSUF") based on the following grounds: (1) evidence not admissible; (2) vague or ambiguous; (3) legal conclusion or opinion; (4) misleading or mischaracterization of facts; (5) duplicative of the joint facts; and (6) conflicting evidence presented. (Dkt. 35-3). In a similar vein, Valeiras objected to the Receiver's portion of the JSUF based on the following grounds: (1) judicial notice not proper; (2) vague and ambiguous;

10

(3) not a material fact; (4) hearsay; (5) lack of foundation; (6) not admissible evidence; (7) conflicting evidence presented; (8) need for personal knowledge; (9) argumentative; and (10) lack of relevance. (Dkt. 36-5).

"When evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) (emphasis in original). The Court doesn't address the entire laundry list of objections the parties raised, but rather focuses on documents or evidence that it relied on to determine whether there's a genuine issue of material fact in dispute. *See Greer v. Cnty. of San Diego*, No. 19-cv-378-JO-DEB, 2023 WL 2316203, at *6 (S.D. Cal. Mar. 1, 2023) ("Because the Court only relies on [certain] records . . . to reach its conclusion, it will only rule on objections to those documents."). Moreover, many of the parties' objections to evidence on grounds of irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are duplicative of the summary judgment standard. *See Burch*, 433 F. Supp 2d at 1119; *see also Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1156 (S.D. Cal. 2022); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (objections for relevance are duplicative of the summary judgment standard).

### i.      Valeiras's Objections

Turning to Valeiras's objections, the Court relied upon the Receiver's statements that Valeiras noted was "[u]ndisputed," "[u]ndisputed, but not a material fact," or "[d]isputed" because Valeiras had evidence to the contrary. (*See generally* Dkt. 36-5). The Court will determine whether a fact is material and if there's a genuine dispute as to any material fact on summary judgment. Fed. R. Civ. P. 56.

The Court also relied on the Receiver's statements as they relate to the forensic accounting performed. First, Valeiras objects to the Court taking judicial notice of certain facts within the Receiver's Forensic Accounting Report. (Dkt. 36-5

at 15–20). As mentioned in footnote one, *supra*, the Court takes judicial notice of the existence of these documents, but doesn't take judicial notice of any disputed facts within. Any objections that judicial notice isn't proper are **OVERRULED**.

Next, Valeiras objects to the Receiver's forensic accounting and evaluation's statements about the sources and uses of funds moving through the bank accounts involved in the ANI Loan Program. Valeiras argues the Receiver lacks personal knowledge to make these statements. Objections for lack of personal knowledge, are misplaced in a motion for summary judgment. *See Burch*, 433 F. Supp 2d at 1119; *see also Cherewick*, 578 F. Supp. 3d at 1156. The objections for lack of personal knowledge are **OVERRULED**.

Lastly, Valeiras objects to the Receiver's statements about the forensic accounting and evaluation on grounds that these statements lack proper evidentiary foundation and are contrary to the Receiver's testimony. Again, the Court will determine whether there is a material fact in dispute, so Valeiras's objection about contrary testimony is unnecessary. As for the objection based on lack of foundation, "foundation may be laid by testimony of a witness who has personal knowledge." *Cherewick*, 578 F. Supp. 3d at 1155 (citing Fed. R. Evid. 901(b)(1)). Although Valeiras tries to argue the Receiver's declaration in unreliable because she admitted her declaration isn't based on her personal knowledge, Valeiras's citation to the Receiver's deposition where she answered that "[m]ultiple people worked on the forensic accounting, including me," (Dkt. 36-5 at 10), suggests the Receiver does have the requisite personal knowledge to lay the foundation for her statements. The objections to the Receiver's various statements about the forensic accounting and evaluation lack foundation are **OVERRULED**.

### ii.     The Receiver's Objections

Turning to the Receiver's objections, the Receiver didn't object to any of Valeiras's statements or evidence the Court relied upon. The Receiver's Objections are **OVERRULED AS MOOT**.

**B.    Summary Judgment**

The Receiver alleges one cause of action against Valeiras for fraudulent transfer in violation of the CUVTA. (Dkt. 1). The parties in their summary judgment motions don't dispute that Champion-Cain operated a Ponzi scheme and solicited Valeiras to become an investor. (Dkt. 31-1 at 4; 32-1 at 7; 36 at 6). Instead, the parties dispute whether (1) VFT's net profit should be considered as part of the ANI Loan Program and (2) VFT should be considered a profiting investor, especially when aggregating the alleged net loss of HAV. (Dkt. 31-1 at 4–19; 32-1 at 20–30).

**i.    Fraudulent Transfer**

The Receiver seeks to recover the fraudulent transfer of $468,041.03 to Valeiras, as trustee of VFT, for fictitious profits that VFT received in connection with its investment in the Ponzi scheme operated by Champion-Cain under the CUVTA. (Dkt. 32 at 2). The CUVTA states in relevant part:

> (a)    A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B)    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Cal. Civ. Code § 3439.04(a). "Courts have routinely applied [CUVTA] to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme

investors." *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008) (citing *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 534 (9th Cir. 1990) and *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)). Because "California's fraudulent transfer act and the federal bankruptcy code's fraudulent transfer provisions are almost identical in form and substance," courts may look to decisions interpreting both in reaching its conclusion. *Id.* at 769–70 (citing *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir. 2008)).

In a Ponzi scheme, the operator "is the 'debtor,' and each investor is a 'creditor.'" *Id.* at 767 (citing *Lehmann*, 56 F.3d at 755). "The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer." *Id.* Generally, if "innocent investors [] received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." *Id.* at 770. According to the Ninth Circuit:

> The policy justification is ratable distribution of remaining assets among all the defrauded investors. The "winners" in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky."

*Id.* (quoting *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991)).

A receiver may seek to recover on two theories of liability because a transfer can be either "actual fraud" or "constructive fraud" under the CUVTA. *Id.* The Ninth Circuit described these two theories:

> Under § 3439.04(a)(1), codifying the "actual fraud" theory, the receiver alleges that the debtor (Ponzi scheme operator) made transfers to the transferee (the winning investor) "[w]ith actual intent to hinder, delay, or defraud" the creditors (the losing investors). "[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent" to defraud. *In re AFI Holding, Inc.*, 525 F.3d at 704 (internal quotation marks omitted); *Agritech*, 916 F.2d at 535. Under § 3439.04(a)(2), codifying the "constructive fraud" theory, the receiver alleges that the transfer of "profits" to the winning investor was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer," because

profits gained through theft from later investors are not a reasonably equivalent exchange for the winning investor's initial investment. *See Scholes*, 56 F.3d at 757. Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," § 3439.04(a)(2)(A), or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due," § 3439.04(a)(2)(B).

*Id.* (alterations in original). Here, although the Receiver alleges recovery of fraudulent transfers on either actual or constructive fraud, (Dkt. 32 at 2), it doesn't matter because recovery under either fraud theory doesn't impact the amount recovered from innocent investors, *Donell*, 533 F.3d at 771.

Admissions, through a guilty plea, that one operated a Ponzi scheme conclusively establishes actual intent under the CUVTA. *In re Slatkin*, 525 F.3d 805, 814 (9th Cir. 2008) (collecting cases) ("[A] debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under [] California Civil Code § 3439.04(a)(1), and precludes relitigation of that issue."). Additionally, a factor in determining actual intent under the CUVTA is "[w]hether the transfer or obligation was to an insider." Cal. Civ. Code § 3439.04(b)(1).

There's no factual dispute that Champion-Cain began operating a Ponzi scheme in 2012 and continued operating it until 2019. (*See* Dkt. 32-5 at Ex. 24; 33 at J-129–34). This alone is enough to establish that a Ponzi scheme existed and there was actual intent to defraud. *See In re Slatkin*, 525 F.3d at 814. However, Valeiras argues that the "Ponzi scheme presumption [can't] leap from the Ponzi scheme operator to any other person . . . . [N]o court of competent jurisdiction has ever found that Peterson was a co-conspirator or illegally aided and abetted Champion-Cain's fraud in even a civil context." (Dkt. 36 at 12; *accord* 31-1 at 12).

While no court has found Peterson was specifically a "co-conspirator," this Court previously determined the Peterson Entities were "insiders" of the Ponzi scheme because they had extensive "business relationships [with Champion-Cain and the Receivership Entities], recruitment efforts, compensation structure, and personal relationship" that indicated they were involved at a "more intimate level" than the typical investor. (Dkt. 32-5 at Ex. 21, 451–52). Because the Receiver has established the required actual intent to defraud to consider the transfer fraudulent under section 3439.04(a)(1), the Court applies the "actual fraud" theory of liability.

### ii.   Payments in Furtherance of the Ponzi Scheme

"[O]nce the existence of a Ponzi scheme is established, payments received by investors as purported profits—i.e., funds transferred to the investor that exceed the investor's initial 'investment'—are deemed to be fraudulent transfers as a matter of law." *In re Slatkin*, 525 F.3d at 814; *see also In re Consol. Meridian Funds*, No. 10-17952, 2013 WL 623570, at *5 (Bankr. W.D. Wash. Feb. 19, 2013) (stating that the Ninth Circuit has adopted a bright line approach "that *any* return to a lender or investor in a Ponzi scheme in excess of the principal investment will not be treated as value, and therefore cannot be counted in determining whether the return was 'reasonably equivalent'" (emphasis in original)).

The source of the profits received by an investor into the Ponzi scheme is regarded as "theft from the other investors." *In re Slatkin*, 525 F.3d at 815. Although it could be argued that the source of the funds received may have been contributed from a legitimate investment, "in truth none of the trades made by [the debtor are] 'legitimate' because the money used for the trades came from investors gulled by [the debtor's] fraudulent representations." *Id.*

The length of time since the profits were received also doesn't matter for determining whether to disgorge the gains received from the scheme. *Donell*, 533 F.3d at 779. In the end, "equity compels that [the investor] share some of the hardship equally with those who lost their initial investment." *Id.* at 780.

16

### a.    VFT Is an Investor in the Ponzi Scheme

The Ninth Circuit "has not adopted a rule which treats victims of a Ponzi scheme differently depending upon whether their investment can be characterized as a financial investment, equity investment or loan." *In re Consol. Meridian Funds*, 2013 WL 623570, at *6. Keeping equity in mind, courts may "delve behind the form of transactions and relationships to determine the substance." *In re United Energy Corp.*, 944 F.2d at 596. Both parties agree that the Court should look at the substance of the transaction over the form. (Dkt. 32-1 at 20–21; 36 at 9).

In *Consol. Meridian Funds*, defendants attempted to argue that they were traditional lenders, not equity investors, who were seeking a return of reasonable interest in exchange for the time value of their loans. *In re Consol. Meridian Funds*, 2013 WL 623570, at *6. However, the court looked at the facts and circumstances surrounding the loans and determined that the loans looked more like investments rather than traditional loans. *Id.* For example, there were aspects "normally associated" with the investments that were also a part of the loan, such as disclosure packages and subscription agreements. *Id.* Furthermore, Meridian Funds's sole purpose was to "offer and sell promissory notes to investors" and the "investors were told that the sole purpose of the investment was to enable the Meridian Funds to invest" those funds into the scheme. *Id.* As a result, the court found that the payment of interest to the defendants pursuant to the loan's terms could be subject to the fraudulent conveyance claim. *Id.* at *7.

Here, VFT's "bridge loan" was no different from other investments solicited by Kim Funding in furtherance of the Ponzi scheme. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 725 (Bankr. S.D.N.Y. 2012), *supplemented* (May 15, 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) ("[T]ransfers must be assessed on the basis of what they really were."). As this Court determined, the Peterson Entities were explicitly created to raise capital for investment in the liquor license lending scheme.

(Dkt. 32-5 at Ex. 21, 452). Both parties agree that Peterson solicited investors to invest in the ANI Loan Program, and in 2014 Peterson solicited Valeiras. (Dkt. 33 at J-22–23).

Valeiras concedes that he decided to invest in the ANI Loan Program through HAV in 2014, (*id.* at J-28), but he argues that VFT's "bridge loan" made in 2016 wasn't meant to be a further investment in the ANI Loan Program, (Dkt. 31-1 at 11–12; 36 at 7, 11; 37 at 2). This characterization is refuted by Valeiras's concessions and the evidence he submitted. First, in February 2016, Peterson approached Valeiras for an increased investment, but because HAV was "fully invested based on its then risk tolerance," the funds "would need to come from a source other than HAV," which prompted Valeiras to propose VFT as the source. (Dkt. 33 at J-37, J-41–42). Peterson initially proposed an additional investment concept "like we have done before (Same Loan Request and Escrow documents provided)." (*Id.* at J-44; Dkt. 31-7). Valeiras rejected the proposal and countered with: "I was thinking structure. Since I have to pay interest on my loan every month, maybe it makes sense to make this a loan to Kim Funding, secured on something, that pays interest monthly at 15% per year on outstanding balances." (Dkt. 33 at J-45; 31-8). Valeiras suggested changing section 1.7 of the 2016 VFT Agreement to reflect the monthly interest payment, but Peterson responded it was better to leave this section alone. (Dkt. 31-9). This appears to be the last email exchanged before the agreement was signed. (*See* Dkt. 31-11). Nothing in these emails establish that VFT's loan wasn't a further investment in the ANI Loan Program.

Second, turning to the agreements themselves, they indicate that Valeiras was aware that the loan was a further investment in the ANI Loan Program. As a starting point for the 2016 VFT Agreement, Peterson and Valeiras used the 2014 HAV Agreement, (Dkt. 33 at J-52; 31-10), where the loan agreement was made between HAV and Kim Funding, including Peterson and the Peterson Family Trust, (Dkt. 31-6 at 1). The agreement reflected that Kim Funding sought financing to be

used solely to fund the escrow accounts in the ANI Loan Program, Kim Funding was affiliated with ANI Development, and Chicago Title would accept the proceeds.[9] (*Id.*). The same language was used in the 2016 VFT Agreement.[10] (*See* Dkt. 31-11). The difference is that the title of the 2016 agreement includes "bridge" and HAV was substituted for Valeiras as trustee of VFT. (*Id.*). Simply changing the title of the agreement from "Loan and Guaranty Agreement" (as used in the 2014 HAV Agreement) to "Bridge Loan and Guaranty Agreement" (as used in the 2016 VFT Agreement) when the other terms are nearly identical doesn't prove the bridge loan wasn't a further investment in the ANI Loan Program. *See In re Consol. Meridian Funds*, 2013 WL 623570, at *6.

Valeiras argues that he made material modifications to the 2016 bridge loan agreement. (Dkt. 31-1 at 4, 11–12; 36 at 12). Specifically, he changed the language to ensure the interest rate wasn't "dictated by the ANI Loan Program in any respect," (Dkt. 31-1 at 12; 36 at 12), and that Kim Funding was required to pay monthly interest, (Dkt. 31-1 at 5–6, 9–11, 14; 33 at J-62; 36 at 9). While the Court recognizes there are differences in the 2014 HAV Agreement and the 2016 VFT Agreement, the purpose of the agreements appear identical to other agreements made by investors in the scheme—including Valeiras. VFT, like other investors, made an agreement to provide funds to Kim Funding in connection with the ANI Loan Program, wired funds directly to Chicago Title for use in the scheme, and received a list of purported liquor license escrows. (Dkt. 31-17; 32-2 ¶ 31). The Receiver testified that "one of the many ways in which funds moved" is the principal goes into the program and then the investment return or interest earned comes

---

[9] Investors who were investing in the ANI Loan Program regularly wired their funds directly to Chicago Title. (Dkt. 33 at P-70).

[10] The agreement terminating the 2016 VFT Agreement also stated VFT agreed to make funds available to Kim Funding "for the purpose of funding Escrow Accounts for License Applicants." (Dkt. 31-17). Nearly identical language from the 2014 and 2016 agreements was used in the 2019 HAV Agreement. (*See* Dkt. 31-19).

back directly from Chicago Title.[11] (Dkt. 31-3 at 18:9–18). Ultimately, it didn't matter who paid because the language of the agreements is clear that Kim Funding was responsible to pay "all principal and unpaid accrued interest" when due. (Dkt. 31-6 at 2; 31-11 at 2). Valeiras's deletion of language that tied the interest rate to the success of the escrow accounts and addition of language that required Kim Funding to provide monthly payments doesn't suggest the transaction wasn't a further investment in the ANI Loan Program.

Valeiras also argues that the 2016 VFT Agreement with Kim Funding was in good faith and for value. (Dkt. 31-1 at 6–7, 10–13; 36 at 14; 37 at 3–4). He claims Kim Funding "received 100% of the fictitious interest from the ANI Loan Program when liquor license escrows purportedly closed with the bridge loan funds Kim Funding borrowed." (Dkt. 36 at 14). The evidence in the record doesn't support these contentions. First, Valeiras admits that Kim Funding didn't receive any interest when the liquor license escrows closed because there were no actual escrows in the Ponzi scheme. (*See* Dkt. 31-1 at 1–2 ("When escrows successfully closed in the ANI Loan Program (which we now know was never) . . . .")). Second, the Court doesn't understand the value VFT provided when Kim Funding only raised money for the Ponzi Scheme. (Dkt. 32-5 at Ex. 21, 452; 33 at P-63). Valeiras's reliance on *In re United Energy Corp.*, 944 F.2d at 596, is unpersuasive because there was nothing of value being generated from the ANI Loan Program. Third, the email communications and 2016 VFT Agreement don't mention that Kim Funding would receive 100% of the interest from the liquor license escrows. (*See* Dkt. 31-7, 31-8, 31-9, 31-11). Rather, as mentioned above, the 2016 VFT

---

[11] The Receiver observed that investors, including Banc of California; VFT; La Jolla Bridge, LLC; ROJ, LLC; and others, received monthly or quarterly payments from the scheme. (Dkt. 32-2 ¶ 31; 33 at P-66). ROJ, LLC agreed to turn over its fictitious `profits, with prejudgment interest, to the Receiver for transferring money to and receiving money from Kim Funding used for the ANI Loan Program. *See* Joint Motion for Judgment, *Freitag v. ROJ, LLC et al.*, No. 21-cv-1732-LAB-AHG (Apr. 24, 2023), ECF No. 27.

Agreement was nearly identical to the agreements signed on HAV's behalf.

Further, if VFT meant to make the loan to Kim Funding who would have control over the funds, then VFT could've easily transferred the money directly to Kim Funding instead of Chicago Title, or Kim Funding could've requested that Chicago Title make any transfers of money directly to it instead of back to VFT. Funds being transferred directly to Chicago Title and then returned directly back to VFT doesn't indicate that Kim Funding had any control. (*See* Dkt. 32-5 at Ex. 3, Ex. 4; 33 at J-74–75, J-76–77). Instead, this indicates that Valeiras didn't make a loan to Kim Funding for value, but made a further investment in the ANI Loan Program on VFT's behalf. *See Donell*, 533 F.3d at 778 (concluding that although the investor thought he "was getting what looked like real profits in return, in fact he never received, 'reasonably equivalent value' for his investment, just cash that was moved around in an elaborate shell game").

While the Receiver has introduced evidence to show VFT invested in the ANI Loan Program, Valeiras fails to provide any evidence to raise a genuine issue of material fact that VFT wasn't investing in the ANI Loan Program. The facts demonstrate that Kim Funding was established to raise capital for the ANI Loan Program; Peterson approached Valeiras for an "additional" investment, which Valeiras accepted on VFT's behalf because HAV was already at its maximum risk tolerance; and Valeiras wired money to Chicago Title with the understanding that the funds were used solely for the ANI Loan Program. Overall, the circumstances surrounding the classification of the 2016 VFT Agreement as a "bridge loan" doesn't preclude the Receiver from recovering the Profit Amount from VFT. Equity requires that Valeiras share some of the hardship equally with those who lost their initial investment. *Donell*, 533 F.3d at 780.

### b.    In-Depth Tracing Analysis Not Required

It's long been established that tracing isn't required when dealing with a Ponzi scheme. *See Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (stating that when an

account is "made up of the fruits of the frauds perpetrated against a myriad of victims" it would be wrong to presume the money out was money the wrongdoer was legally and honestly allowed to use); *Donell*, 533 F.3d at 774 (declining to require tracing because it's "unsupported by law and would be unmanageable in practice"). In a Ponzi scheme, one doesn't have to demonstrate the source of each transfer to determine whether it was legitimate. *In re Slatkin*, 525 F.3d at 814-15 (requiring the return of purported profits received by an investor because these profits are considered theft from other investors and would prevent injustice); *Donell*, 533 F.3d at 774 (quoting *In re Lake States Commodities, Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000)) ("[T]he trustee need not match up each investment with each payment made by the debtor and follow the parties' characterizations of the transfers. This may be the only workable rule in the typical Ponzi scheme case." (alteration in original)).

Here, it's undisputed that between March 7, 2016, and July 12, 2017, VFT made five transfers of money to Chicago Title for a total of $3,300,000. (Dkt. 32-5 at Ex. 3; 33 at J-74–75). Between April 8, 2016, and November 8, 2017, VFT received twenty-one transfers of money from Kim Funding for a total of $468,041.03. (Dkt. 32-5 at Ex. 5; 33 at J-78–79). Between September 29, 2016, and November 10, 2017, VFT received eight transfers of money from Chicago Title for a total of $3,300,000. (Dkt. 32-5 at Ex. 4; 33 at J-76–77). These transfers reflect the money exchanged in connection with the 2016 VFT Agreement. (*See* Dkt. 32-5 at Ex. 6; 33 at J-80).

Valeiras argues "there is no evidence that the source of Kim Funding's money to pay monthly interest came from the ANI Loan Program." (Dkt. 31-1 at 9). The Receiver acknowledges that the Kim Funding Accounts received deposits from Peterson Family Trust, ANI Development, Chicago Title, and investors. (Dkt. 33 at J-81; 36-3 at 28:15–19). However, the Receiver's "macro" level analysis revealed that ninety-eight percent of the net source of funds were funds related to

the scheme, including funds from Chicago Title accounts, ANI accounts, and other investors.[12] (Dkt. 32-2 ¶ 29; 32-5 at Ex. 1, Ex. 2). The evidence shows the money Kim Funding used to pay VFT was necessarily funds from the ANI Loan Program. Although the Receiver needn't perform a tracing analysis of the Kim Funding Accounts, the "macro" level analysis revealed the commingling of funds related to the ANI Loan Program. Valeiras doesn't provide any contrary evidence to prove Kim Funding's money used to pay VFT was from a source that wasn't involved in the ANI Loan Program. *Cf. Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (citing *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)) (determining a party has abandoned claims that weren't raised in opposition to the other side's motion for summary judgment).

Moreover, the Receiver asserts she is only trying to recover the $468,041.03 in fictitious profits "by avoiding and recovering a portion of the $1,125,000 transfer that Chicago Title made to VFT on November 10, 2017, the last transfer received by VFT on its investment in the scheme" and "that transfer [was] unquestionably a direct transfer to VFT from the Ponzi scheme (the 'holding funds' escrow account [that] Chicago Title used for the Ponzi scheme), which can be avoided by the Receiver." (Dkt. 32-1 at 26 (citing Cal. Civ. Code § 3439.08(b)(1)(A) and *Wiand v. Lee*, 753 F.3d 1194, 1203 (11th Cir. 2014)); 38 at 2). In other words, VFT made transfers into the scheme totaling $3,300,000, so this was the maximum restitution it could claim. (Dkt. 35 at 5). The restitution was reduced for each payment VFT received, which was $2,643,041.03 prior to Chicago Title's final payment of $1,125,000 on November 10, 2017. (*Id.*). Once Chicago Title transferred the $1,125,000 to VFT, VFT received a total of $3,768,041.03 from the scheme, which is $468,041.03 more than its full restitution claim. (*Id.* at 6). Valeiras doesn't contest

---

[12] During the period between April 8, 2016, and November 8, 2017, the Kim Funding Accounts total balance went from $46,853.40 to $222,199.80, which included deposits totaling $18,508,111.09 and disbursements totaling $18,332,764.69. (Dkt. 32-2 ¶ 24).

21-cv-1625-LAB-AHG

that he received back a total of $3,768,041.03 in connection with the 2016 VFT Agreement. (*See* Dkt. 33 at J-76–79). The Receiver has provided enough evidence to show that she may recover the Profit Amount as a fraudulent conveyance.

### c.    Amount the Receiver May Recover

Federal courts apply a "netting rule" to determine whether the investor is liable. *Donell*, 533 F.3d at 771. Courts look at the amount initially invested and if there were any returns to the investor. *Id.* If the net is positive, the court determines the actual amount of liability "depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith." *Id.* If the net is negative, the good faith investor isn't liable because "payments received in amounts less than the initial investment . . . are not avoidable within the meaning of [CUVTA]." *Id.*

To determine the amount of liability, the Court must net the amounts Valeiras received against any deposits he made. *See id.* at 773. In support, the Receiver submitted a declaration and evidence that a forensic accounting was conducted, which verified the total amount received by Valeiras in excess of his deposits was $468,041.03. (Dkt. 32-2  ¶ 32;  32-5  at Ex. 6). While Valeiras argues the $468,041.03 he received from Kim Funding wasn't part of the scheme, he doesn't contest receiving a total of $3,768,041.03 in connection with the 2016 VFT Agreement. (*See* Dkt. 33 at J-76–79). Once Chicago Title made the last payment to VFT on November 10, 2017, for $1,125,000, this put VFT into the "winning investor" category subject to clawback of the fictitious profits. (*See id.* at J-80; *see also* Dkt. 32-5  at Ex. 6;  38  at 2,  6). Having reviewed all the supporting documentation submitted by the Receiver, the Court is satisfied that liability in the amount of $468,041.03 is supported by the record.

### iii.    VFT's Profits May Not Be Aggregated with HAV's Losses

"The creation of a distinct legal entity destroys the identity of interests required for a setoff." *In re Slatkin*, 243 F. App'x 255, 259 (9th Cir. 2007) (citing *In re Visiting*

*Home Serv., Inc.*, 643 F.2d 1356, 1360 (9th Cir. 1981)); *cf. Scholes v. Ames*, 850 F. Supp. 707, 713 (N.D. Ill. 1994), *aff'd sub nom. Scholes v. Lehmann*, 56 F.3d 750. ("[A] claim arising out of an independent transaction with one party may not be used as a set-off against another independent claim, even if the transaction is related to the claim in dispute."). When two investments are distinct and made under separate names, an investor isn't entitled to offset the gains of one with the losses of another. *Ames*, 850 F. Supp. at 713. Although partnerships in California aren't ordinarily considered a legal entity distinct from their individual partners, when dealing with equity principles, there's a general tendency to recognize a partnership as a body of itself. *Park v. Union Mfg. Co.*, 45 Cal. App. 2d 401, 405 (1941).

The Court is disinclined to aggregate VFT's profits with HAV's alleged losses because VFT and HAV are distinct entities. Valeiras contends that the cases cited by the Receiver are all irrelevant because they deal with separate persons or separate legal entities. (Dkt. 36 at 17–18). The Court disagrees. In *Hecht v. Inv. #1113*, No. 13-5382, 2014 WL 12610217, at *3 (E.D. Pa. Dec. 1, 2014), the court determined that the husband and wife had separate accounts because they took a position with the IRS that the accounts were separate. *But see Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *9, 29 (S.D.N.Y. Mar. 24, 2010) (rejecting that the receiver is entitled to void transfers from two accounts that were net winners without accounting for investments made in four other accounts that were net losers when these six accounts were for the benefit of the husband, wife, and/or their children). Similarly, in *Ames*, the court treated investments made by the investor and his broker as distinct and separate. *Ames*, 850 F. Supp. at 713. There the court determined that allowing a setoff would allow for double recovery because the broker also made a claim to recover the investment he made under his own name. *Id.* at 713–14.

Here, Valeiras made it a point to indicate that HAV and VFT were distinct entities. Valeiras admitted that he treated HAV and VFT as separate and distinct

entities "for some purposes." (Dkt. 32-5 at Ex. 8, 67–68). In 2017, when Peterson approached Valeiras about making another loan, Valeiras "decided that any loan to Kim Funding would need to come from a source *other than HAV*" because HAV was fully invested based on its risk tolerance. (Dkt. 33 at J-41 (emphasis added)). Then in December 2018, after VFT and HAV terminated their agreements, Peterson approached Valeiras about making another loan, which Valeiras "declined on behalf of VFT, but accepted the opportunity on behalf of HAV." (*Id.* at J-97). The only logical conclusion is that Valeiras kept VFT and HAV as distinct entities otherwise it wouldn't have matter which entity provided the funds.

Additionally, HAV, not VFT, asserted an insurance claim against Chubb and sued Chicago Title. (*See id.* at J-123–24, J-135–38). When HAV calculated its net loss for the settlement in the *Levin Action*, it didn't include the $468,041.03 net gain that VFT received under the 2016 VFT Agreement, (*id.* at P-99), further suggesting that Valeiras believed the entities to be separate and distinct. There may even be a potential double recovery issue if the Court provides a setoff because HAV received its settlement in the *Levin Action*, where HAV's losses weren't reduced by VFT's profits, and VFT now seeks to further setoff VFT's profits with HAV's losses. *Ames*, 850 F. Supp. at 713 (declining to allow a setoff because it would allow for double recovery).

Moreover, when HAV entered into the 2019 HAV Agreement and provided funds, VFT, the Valeiras Rollover IRA, and the Valeiras Roth IRA were limited partners and held approximately 36.1% of the interest. (*Id.* at P-86). This left approximately 62.5% of the interests in HAV to non-Valeiras limited partners, (*id.* at P-87), and 1.4% of the interest to Frontier as the general partner, (*id.* at J-114). Valeiras provides no support that the Court should aggregate the profits and losses when, at the time of the transfer, 62.5% of the partnership consisted of non-Valeiras interests. (*See* Dkt. 36 at 15–19); *cf. In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010) ("Reasonably equivalent value is the value of the property on the date of the

transfer from the perspective of the creditors."). The fact that HAV bought out its limited partners, excluding VFT, and transferred their interests to VFT after the receivership was established to reflect a net loss on Valeiras's taxes doesn't change the MIMO calculation. *See Donell*, 533 F.3d at 779 ("Decline[d] to permit good faith investors to claim offsets for taxes or other expenses paid in connection with receipt and management of income from a Ponzi scheme.").

Even if the Court was willing to engage in this exercise of aggregation, HAV doesn't have a net loss. Valeiras requests the Court aggregate VFT's profits with HAV's alleged losses, which would result in an overall net loss of $227,961. (Dkt. 31-1 at 14, 18; 31-4 ¶¶ 4–5; 36 at 15–19). According to Valeiras, the Receiver testified that HAV had a net loss of $666,227.97. (Dkt. 36 at 15). The Receiver concedes that she initially determined that HAV had a net loss, but this didn't take into account the Chubb insurance claim and settlement for $1,250,000. (*See* Dkt. 31-18; 38 at 9). After taking into account the Chubb insurance claim and settlement, HAV no longer had a MIMO net loss. (Dkt. 38 at 9). The Court agrees that once the Chubb settlement payment was included in the calculations, HAV no longer had a net loss. (*See* Dkt. 33 at J-142). Once the $1,250,000 is added to the revised claim packet loss of $666,227.86, HAV actually received a profit of $583,772.14. Valeiras doesn't dispute this math.[13] (*See* Dkt. 36 at 15–19).

The Court won't aggregate VFT's profits with HAV's alleged net loss because VFT and HAV are distinct entities, Valeiras intended to keep VFT and HAV as separate and distinct entities, and HAV has recovered its net loss through the settlements with Chubb and Chicago Title.

---

[13] Additionally, Valeiras argues the Receiver agreed not to pursue a fraudulent transfer claim against VFT after the parties signed the *Levin Action* settlement. (Dkt. 36 at 10, 19–21). The Receiver responds that the estoppel argument is completely frivolous. (Dkt. 38 at 10). The evidence doesn't establish that the Receiver agreed or represented that VFT wouldn't be subject to a fraudulent transfer claim. (*See* Dkt. 32-5 at Ex. 15; 36-4; 39); *see also* Tr. Motion Hearing, *SEC Action* (Dec. 18, 2020), ECF No. 548 at 40:14–17.

### C.    Prejudgment Interest

In cases seeking to recover fraudulent transfers received from Ponzi schemes, courts may, at their discretion, "permit the receiver to recover pre-judgment interest on the fraudulent transfers from the date each transfer was made." *Donell*, 533 F.3d at 772 (citations omitted). Prejudgment interest is an "ingredient of full compensation that corrects judgments for the time value of money." *Id.* (internal quotation marks and citation omitted). The court is bound by considerations of fairness in making its determination, and prejudgment interest should be awarded when it's necessary to make the wronged party whole. *See In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994). In determining the amount of prejudgment interest awarded, California uses a seven percent per annum rate for fraudulent transfer cases. Cal. Const. art. XV, § 1; *see also* Default Judgment Order, *Levene Action* (Oct. 10, 2022), ECF No. 11 (granting seven percent prejudgment interest from date of last transfer to when order was issued).

The Court has carefully considered the parties' arguments and finds that the award of prejudgment interest is consistent with the balance of equities. The prejudgment interest is **GRANTED** in the amount of $209,230.56 (the "Prejudgment Interest Amount").[14]

## IV.   CONCLUSION

As the Ninth Circuit stated, "Ponzi schemes leave no true winners once the scheme collapses—even the winners were defrauded, because their returns were illusory." *Donell*, 533 F.3d 762 at 779. "[E]quity compels that [Valeiras, as trustee of VFT,] share some of the hardship equally with those who lost their initial investment." *Id.* at 780. The Receiver's Motion for Summary Judgment is

---

[14] The prejudgment interest amount was calculated by: (1) taking the Profit Amount and multiply it by seven percent, (2) then dividing that amount by 365 to get the per diem interest amount of $89.76, and finally (3) multiplying $89.76 by the number of days between November 10, 2017, and March 29, 2024, which is 2,331 days, amounting to a total of $209,230.56.

**GRANTED**, (Dkt. 32), and Valeiras's Motion for Summary Judgment is **DENIED**, (Dkt. 31). The Receiver is awarded the Profit Amount and the Prejudgment Interest Amount, totaling $677,271.59. The Clerk is directed to enter judgement accordingly and then terminate this case.

     **IT IS SO ORDERED**.

Dated:  March 29, 2024

                                    Honorable Larry Alan Burns
                                    United States District Judge